**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>  DRALA MOUNTAIN CENTER (f.k.a. SHAMBHALA MOUNTAIN CENTER), a Colorado non-profit corporation,<br><br>EIN: 84-1535130<br><br>Debtor. | Chapter 11, Subchapter V<br><br>Case No. 22-[_____] ([____]) |

**DECLARATION OF MICHAEL GAYNER,**
**EXECUTIVE DIRECTOR OF THE DEBTOR,**
**<u>IN SUPPORT OF SUBCHAPTER V PETITION AND FIRST DAY MOTIONS</u>[1]**

I, Michael Gayner, hereby declare under penalty of perjury:

1.      I am the Executive Director of Drala Mountain Center, a Colorado non-profit corporation and the debtor and debtor in possession ("<u>DMC</u>" or the "<u>Debtor</u>") in the above-captioned Subchapter V case.  As Executive Director, I am responsible for the overall management of DMC, including its strategic planning, operations, and finances.

2.      I joined DMC as Director of Guest Services in October 2010 and became Executive Director in July 2012.  I received my Ph.D. in Education from the Ontario Institute for Studies in Education at the University of Toronto.  Prior to joining DMC, I owned and operated a benefits management company.

3.      Contemporaneously with the filing of this declaration (this "<u>Declaration</u>"), DMC, as Debtor, filed a voluntary petition (the "<u>Petition</u>") in the United States Bankruptcy Court for the District of Colorado (this "<u>Court</u>") for relief under Subchapter V of chapter 11 of title 11 of the

---

[1]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the relevant First Day Motions (as defined below), as applicable.

United States Code.  To minimize the potential adverse impact of the commencement of this Subchapter V case, the Debtor has requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section V below (collectively, the "<u>First Day Motions</u>").  The First Day Motions seek relief intended to preserve the value of the Debtor by, among other things, honoring deposits made by participants registering for programs, satisfying certain wage, customer and other prepetition claims and granting administrative and operational relief to facilitate an orderly transition into and out of this Subchapter V case.  This relief is critical to the Debtor's restructuring and reorganization efforts.

4.      Based on my tenure with DMC, my review of relevant documents, and my discussions with other members of DMC's management team and professional advisors, I am familiar with DMC's day-to-day operations, business, and financial affairs.  I submit this Declaration in support of the Petition and First Day Motions and to assist the Court and other parties in interest in understanding DMC's history, non-profit mission, business operations and prepetition capital structure, and the circumstances leading to DMC's commencement of this Subchapter V case on the date hereof (the "<u>Petition Date</u>").  To that end, this Declaration provides an overview of this Subchapter V case in five parts: ***Part I*** provides background on DMC's non-profit corporate history, non-profit mission, and business operations; ***Part II*** provides an overview of DMC's prepetition capital structure; ***Part III*** describes the circumstances leading to this Subchapter V filing; ***Part IV*** describes DMC's proposed use of cash collateral; and ***Part V*** provides the factual basis for the relief requested in the First Day Motions.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of DMC's operations and finances, information learned from my review of relevant documents or supplied to me by other members of DMC's management team

2

and professional advisors, and my opinions based on my personal experience and knowledge.  In some places, I cite to news articles or other information that I feel would provide context for the Court.  I am authorized to submit this Declaration on behalf of DMC.  If called upon as a witness, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

## **OVERVIEW**

6.      Drala Mountain Center (f/k/a Shambhala Mountain Center) was founded 50 years ago, in 1971, by Chögyam Trungpa Rinpoche, a Tibetan Buddhist meditation teacher, as a retreat center for meditation and practice in the tradition of the Kagyu and Nyingma lineages of Tibetan Buddhism.  Chogyam Trungpa described his decision to purchase the land that became DMC as follows:

> There was a valley with pine trees and rocks that has never been cultivated.  Should we buy an empty desolate valley without any facilities?  We drove through and the only thing we could see was lots of wild horses.  Nothing was civilized at all in terms of electricity or the establishment of any kind of human habitation. Nonetheless, I decided to take this place because it felt wholesome and good.  There was a rocky point, which we now call Marpa Point,[2] and the surroundings, which were nice areas, and everything seemed to be ideal.  It was as if somebody had been waiting for that particular land to be occupied, and we became the first people who actually trod on it.  I said, "Yes, let's do it.  Let's buy it."[3]

In the years since, DMC has sponsored thousands of programs and individual meditation retreats and hosted visits and teachings by some of the greatest Buddhist teachers of the 20th and 21st centuries, including His Holiness the 14th Dalai Lama, His Holiness the 16th Karmapa, His Holiness Dilgo Khyentse Rinpoche, Dzigar Kongtrul Rinpoche, Thrangu Rinpoche, and Pema

---

[2]     Marpa Point is named after Marpa Lotsawa (1012 – 1097), a Tibetan Buddhist teacher in the Kagyu lineage who translated and brought Buddhist teachings from India to Tibet.

[3]     Jim Lowrey, *Taming Untamable Beings: Early Stories of Chogyam Trungpa Rinpoche with the Pygmies & Other Hippies* 134 (Blue Horse, 1st ed. 2015) (quoting Barbara Stewart, *Conquering Ruggedness*, VAJRADHATU SUN, February-March 1981).

Chödrön, as well as secular programs taught by leaders on subjects ranging from Dharma art, yoga, writing, and martial arts to leadership and other subjects.

7.     DMC is a 501(c)(3) non-profit corporation formed under the Colorado Revised Nonprofit Corporation Act.  Formerly known as Shambhala Mountain Center, DMC changed its name in February 2022 to Drala Mountain Center.[4]  Its non-profit mission is to bring people together to experience wisdom and to serve as a catalyst in creating an enlightened society, grounded in wisdom and kindness towards individuals, the community, and the natural environment.

8.     DMC's facilities are located in Red Feather Lakes, Colorado, in an expansive, scenic mountain haven that combines natural beauty, unspoiled wilderness, blue skies, and crisp mountain air with the comforts of a modern retreat campus.  DMC provides meeting facilities, dining, lodging, and year-round Buddhist and secular programs on meditation, mind and body awareness, contemplative arts, leadership, yoga, and other areas of personal and social transformation.

9.     One of its most significant landmarks is The Great Stupa of Dharmakaya (the "Great Stupa"), a superb example of sacred Buddhist architecture, built over a 13-year period by hundreds of volunteers and funded entirely through donations.  Although located on adjacent land owned by Shambhala USA (f/k/a Shambhala International (Vajradhatu)) ("Shambhala USA"), a non-profit corporation with a shared mission, the Great Stupa is open to the public, is managed by DMC, and is accessible to DMC program participants.

---

[4]     In Tibetan, "drala" means "beyond aggression." In the 1970s and 1980s, Tibetan Buddhist meditation teacher Chögyam Trungpa Rinpoche developed a body of teachings known as the "drala principle," which explores the sacred energy and power that exists when people step beyond aggression.



10.    In recent years prior to the COVID-19 shut-down, DMC hosted, on average, more than 10,000 overnight guests and day visitors per year and received over 5,500 individual donations, totaling on average over $750,000 per year.  The global COVID-19 pandemic forced DMC to close its facilities to the public from March 2020 to July 2021, resulting in a significant loss of revenues from lodging and on-site programs.  In addition, in August 2020, the devastating Cameron Peak wildfire swept through DMC land, requiring DMC's residential staff to evacuate to safety, destroying many buildings and tent platforms (but sparing the Great Stupa), and damaging water, sewer, and electrical systems.  DMC's programing was also adversely affected in 2018 and 2019 by a "Me Too" scandal involving a prominent Buddhist teacher and leader,

Sakyong Mipham Rinpoche, resulting in the cancellation of a number of large annual retreat programs.

11.     With the help of its strong community of volunteers, donors, and visitors, DMC believes that these set-backs are temporary.  DMC has continued its non-profit mission during the COVID-19 shutdown, including by offering online programs via Zoom.  Following the Cameron Peak wildfire, DMC donors contributed more than $600,000 to rebuild and repair the fire-damaged property.  In July 2021, DMC re-opened its facilities on a limited basis under COVID-19 guidelines developed in consultation with an epidemiologist and federal, state, and local recommendations.  Since re-opening, DMC has held in-person programs that have been oversubscribed and welcomed more than 1,300 overnight guests, 600 online participants, and thousands of day visitors.

12.     In 2005, DMC financed building development through a combination of economic development revenue bonds and secured loans from Wells Fargo Bank, N.A. ("Wells Fargo").  On July 29, 2015, DMC and Wells Fargo entered into a restructuring agreement (the "Restructuring Agreement") that consolidated all of DMC's outstanding funded debt into a single secured loan from Wells Fargo in the original principal amount of $4,150,000.  The restructured Wells Fargo debt provided for monthly principal and interest payments in the amount of $24,300, with a June 1, 2016 maturity date (the "Wells Fargo Loan").  The Wells Fargo Loan was secured by certain of DMC's personal property and deeds of trust on real estate owned or used by DMC.

13.     DMC and Wells Fargo amended the Restructuring Agreement multiple times, extending the maturity date of the Wells Fargo Loan to November 30, 2019, in exchange for lender fees, incremental increases to the interest rate from 5% to 6.25% per annum, and monthly principal and interest payments of $24,300.  In September 2019, Wells Fargo notified DMC that it would

not continue extending the maturity date of the Wells Fargo Loan. DMC entered into a series of forbearance agreements with Wells Fargo from December 2019 to February 2021. Pursuant to these forbearance agreements, Wells Fargo agreed to accept reduced monthly payments of $5,000 and to forbear from exercising its legal remedies through October 31, 2021. During the forbearance period, based on my information and belief, Wells Fargo commissioned an appraisal of DMC's primary real estate, dated December 10, 2020, that determined the value of the property to be $7,700,000.[5]

14.     In May 2021, Wells Fargo sold the Wells Fargo Loan to RH Fund XXII, LLC, a distressed debt fund managed by Red Hills Holdings, LLC ("Red Hills"). According to its website, Red Hills is a private investment firm, formed in 2008, that acquires small-to-medium-size investments in commercial loans, real estate and other asset based opportunities, including non-performing loans. Its website states that, as of December 2018, Red Hills had acquired close to $300 million of commercial and residential assets throughout the United States.[6] Following negotiations, on November 1, 2021, DMC and Red Hills entered into a new forbearance agreement (the "Red Hills Forbearance Agreement"), which (i) extended the forbearance period for the Wells Fargo Loan to February 28, 2022, (ii) required DMC to make a one-time forbearance payment of $25,000 to be applied to accrued interest, and (iii) provided for continued $5,000 monthly interest payments by DMC. Under the terms of the Red Hills Forbearance Agreement, interest accrues at a non-default rate of 6.25%.

15.     In October 2021, DMC commissioned its own appraisal of its real estate from DRM Real Estate Advisors, LLC. The independent appraiser determined that, based on comparable

---

[5]     DMC understands that on June 12, 2020, Wells Fargo also commissioned an appraisal of a residential house owned by DMC, known as the Monroe House, which determined the value of the Monroe House to be $400,000.

[6]     *See* Red Hills Company Profile, at www.redhillsholdings.com/about (accessed on February 28, 2022).

sales, the estimated market value of DMC's real property and furniture, fixtures and equipment (excluding specialized artwork and ritual objects) was $7,000,000, as of October 2, 2021.

16.     During the forbearance period, DMC has dedicated significant efforts towards raising funds from donors to pay down the Wells Fargo Loan.  On February 4, 2022, the Pema Chödrön Foundation, a non-profit foundation dedicated to sharing the teachings of renowned Buddhist teacher Pema Chödrön, committed to donate $500,000 to DMC (the "Pema Chödrön Foundation Donation"), conditioned on (i) DMC's receipt of matching donations totaling $500,000, (ii) DMC's commitment to launch a fundraising campaign during 2022 with a target goal of an additional $500,000 in donations, and (iii) either a refinancing or restructuring of the Wells Fargo Loan on terms satisfactory to the foundation.  The Pema Chödrön Foundation's commitment letter is attached as **Exhibit A** hereto.   In February 2022, DMC obtained commitments for $220,000 in matching donations from six donors.  Of this amount, $210,000 is currently held in escrow pending the successful completion of this Subchapter V case.  To satisfy the contingencies for the Pema Chödrön Foundation Donation, DMC is continuing to raise matching donations and plans to launch a fundraising campaign for an additional $500,000 during the summer of 2022.

17.     Despite good faith negotiation efforts by DMC and Red Hills, the parties were unable to agree on the terms of a restructured Wells Fargo Loan.  DMC filed this Subchapter V case to preserve its non-profit mission and to restructure the Wells Fargo Loan through a Subchapter V plan of reorganization.  A successful Subchapter V restructuring will allow DMC to continue its non-profit mission, remain a resource for its community, and benefit its creditors, volunteers, donors, program participants, visitors, and other stakeholders.

## I.    DRALA MOUNTAIN CENTER'S HISTORY AND BUSINESS OPERATIONS

### A.    Drala Mountain Center History

18.    Established in 1971 in Red Feather Lakes, Colorado, by a Tibetan meditation master, DMC is one of the oldest Buddhist meditation and retreat centers of its kind in the United States.   DMC's facilities are located in a beautiful and scenic valley of the Colorado Rocky Mountains, West of Fort Collins and approximately two hours away from Denver, Colorado. DMC is home to the Great Stupa, a stunning example of Buddhist sacred architecture that promotes harmony, prosperity, longevity, good health and peace, as well as the Kami Shrine, a Japanese Shinto shrine.



19.    DMC began as a remote meditation retreat for a small Buddhist community in Boulder, Colorado.   Over the past 50 years, DMC has expanded into a welcoming spiritual and community center offering a wide variety of lodging and dining facilities, meeting facilities,

meditation retreats, and numerous on-site and online programs, classes, trainings and workshops, attracting program participants from across the United States and around the world. DMC encourages members of the public to visit its facilities and to attend its online programs. Given its non-profit mission, DMC offers sliding-scale tuition, discounts, and subsidies in order to be accessible to as many people as possible, regardless of financial ability to pay.

20.    DMC is affiliated with Shambhala International, a global organization based in Halifax, Nova Scotia, that serves more than 200 local Shambhala centers and groups, spanning six continents with operations in more than 50 different countries.[7] However, DMC is a separate standalone non-profit corporation that is managed solely by its own six-member board of directors without control or oversight from any other affiliated entity.

### B.    Drala Mountain Center Operations

21.    As of the Petition Date, the Debtor has approximately 33 employees, including 22 full-time and 11 part-time employees. DMC generates revenues primarily through the following: (a) charitable donations and volunteers, (b) lodging and dining accommodations; (c) meeting facilities for event hosting and group activities; (d) fees from online and on-site retreats, programs and workshops; and (e) gift store sales.

#### 1.    Charitable Donations and Volunteers

22.    A significant portion of DMC's operations is funded by donations from a large community of supporters. DMC engages in several fundraising activities throughout the year and solicits grants, one-time and monthly donations, corporate matches, donations of appreciated securities, bequests, and in-kind donations such as vehicles. Since the beginning of 2021, DMC has received over $540,000 in charitable donations, including recurring automatic withdrawal

---

[7]    *See* SHAMBHALA, https://shambhala.org/about-shambhala/shambhala-global-community/ (last visited February 28, 2022).

donations totaling approximately $10,800 per month from 335 monthly donors.  In addition, DMC benefits from its numerous volunteers, who contribute their time and energy to teach, assist with programs, and help maintain DMC's properties.

### 2. Lodging and Dining

23.     DMC offers a variety of living accommodations for program participants and visitors to meet any budget and desired level of fellowship.  Visitors have the option to rent (i) fine lodge rooms with private baths, (ii) beds in shared same-gender dormitories, (iii) rustic cabin rooms, or (iv) seasonal tents.  Standard (non-discounted) prices range from $90 to $299 per person, which include three buffet-style meals per a day cooked with great care and love, with healthy and natural ingredients, for omnivore, vegetarian, vegan, and/or wheat-free diets.  DMC can host up to 150 guests in its private and shared rooms during the winter.  In the summer, seasonal tents increase this capacity to 450 guests.  In addition to DMC's programs (as described in more detail below), visitors enjoy free access to several miles of hiking trails and meditation spaces.  Prior to the COVID-19 pandemic, DMC hosted more than 12,000 guests each year, generating over $1.6 million in lodging revenues in 2018 and $1.3 million in lodging revenues in 2019.  Since re-opening its facilities in July 2021 under COVID-19 restrictions, DMC has averaged approximately $55,000 in monthly lodging revenues.




### 3.    Meeting Facilities

24.    DMC offers five meeting facilities for rent to educational, spiritual, and other groups in a range of sizes and architectural styles, from the small, intimate Great Eastern Sun meeting space to the large Summer Conference Tent.  The five facilities (the Sacred Studies Hall, Rigden Lodge, Red Feather Conference Center, Summer Conference Tent, and Great Eastern Sun) seat between 45 and 450 participants.  Rental rates for these facilities currently range from $200 to $550 per day.  DMC generated over $575,000 in facility rental revenues in 2018 and over $650,000 in facility rental revenues in 2019.  Since re-opening its facilities in July 2021 under COVID-19 restrictions, DMC has averaged approximately $47,000 in monthly facility rental revenues.

### 4.    Programs and Workshops

25.    DMC offers on-site and online year-round programs on meditation, mind and body awareness, contemplative arts, leadership, yoga, and other areas of personal and social transformation.  These programs are designed to help participants meditate, relax and reconnect with their values, calm their minds, rejuvenate their bodies, and awaken their insight and inspiration.  Programs are available for students of all levels of experience and backgrounds, are taught by an array of accomplished practitioners, instructors and teachers, and may be held over one day or several days.  In addition, DMC provides a popular summer family camp where families can participate in fun activities such as guided hiking, kite flying, calligraphy, Dharma art, storytelling, and singing.  DMC's program offerings vary by season, with smaller and less frequent programs in the winter as opposed to the summer.  DMC generated over $600,000 in program revenues in 2018 and over $475,000 in program revenues in 2019.  Since re-opening its facilities

on a limited basis in July 2021 under COVID-19 restrictions, DMC has averaged approximately $41,000 in monthly program revenues.



### 5.  Gift Store

26.     DMC operates an on-site gift store, where visitors can purchase books, journals, meditation supplies, jewelry, clothing, snacks, drinks, and other items.  DMC generated over $60,000 in gift store sales in each of 2018 and 2019.  Since re-opening its facilities on a limited basis in July 2021 under COVID-19 restrictions, DMC has averaged approximately $2,000 in monthly gift store sales.

### 6.  Other Revenues

27.     Prior to the COVID-19 pandemic, DMC also derived donation revenues from

guided tours of the Great Stupa.[8]  In addition, DMC has been awarded government grants for forestry conservation work.  These grants were used to fund a three-phase project to restore and apply wildfire mitigation techniques to several hundred forest acres, with DMC receiving $350,000 in 2018 to complete phase one and $350,000 in 2021 to complete phase two.  Phase three will cover approximately 120 acres and is expected to be completed in 2023.  Upon completion, DMC will receive the final grant installment estimated to be between $150,000 and $200,000.  DMC has earned several awards for its work and partnership in these forestry initiatives, including the 2019 Environmental Stewardship Award from the Larimer County Commissioners.[9]



## II.     DMC'S PREPETITION CAPITAL STRUCTURE

28.     As of the Petition Date, the Debtor has approximately $4.2 million in principal

---

[8]     The Great Stupa is currently closed to the public.

[9]     *See SMC Receives Environmental Stewardship Award*, June 17, 2019, https://blog.shambhalamountain.org/smc-receives-environmental-stewardship-award/.

amount of funded debt obligations (exclusive of accrued interest and fees).[10]  The following charts depict the Debtor's funded debt structure:

| Type of Debt | Description | Collateral | Approximate Principal Amount Outstanding |
|---|---|---|---|
| Wells Fargo Loan | consolidated secured promissory note | first lien on certain personal and real property of the Debtor and certain real estate of Shambhala USA | $3,863,071.36 |
| Felice Owens First Promissory Note | secured promissory note | Amitabha thangka (artwork) | $25,406.96 |
| Felice Owens Second Promissory Note | secured promissory note | Amitabha thangka (artwork) | $45,992.23 |
| Shambhala USA First Promissory Note | unsecured promissory note | none | $150,000.00 |
| Shambhala USA Second Promissory Note | unsecured promissory note | none | $80,000.00 |
| Robert & Lindy King Promissory Note | unsecured promissory note | none | $66,587.32 |
| Michael Gayner Promissory Note | unsecured promissory note | none | $6,000.00 |
| Total | | | $4,237,057.87 |

### A.  Wells Fargo Loan

29.   As described above, on July 29, 2015, DMC issued a secured, consolidated promissory note, evidencing the Wells Fargo Loan, in the original principal amount of $4,150,000. The Wells Fargo Loan currently has a principal balance of $3,863,071.36 and bears interest at the non-default rate of 6.25% per annum.  Under the terms of its forbearance with Red Hills, DMC also acknowledged that, as of October 31, 2021, it owed approximately $338,869.66, in accrued and unpaid interest and $37,500 in deferred fees.   The Wells Fargo Loan is secured on a first lien

---

[10]   In both 2020 and 2021, DMC also received Paycheck Protection Program Loans totaling $578,000, both of which have been fully forgiven.

basis by certain personal and real property of DMC. Red Hills, as acquirer of the Wells Fargo Loan, does not have account control agreements and, therefore, does not have a perfected security interest in DMC's deposit accounts or any security interest in cash proceeds of DMC's restricted and unrestricted donations. The Wells Fargo Loan matured on November 30, 2019, and was subject to forbearance through February 28, 2022.

### B.  Owens Notes

30.     On February 25, 2021, DMC issued a promissory note in favor of Felice Owens in the original principal amount of $35,000 (the "First Owens Note"). The First Owens Note has a maturity date of December 1, 2022, and accrues interest at a rate of 5% per annum. As of the Petition Date, approximately $25,406.96 in principal amount remains outstanding on the First Owens Note. On February 14, 2020, DMC issued a promissory note in favor of Felice Owens in the original principal amount of $45,992.23 (as modified on August 20, 2021, the "Second Owens Note"). The Second Owens Note has a maturity date of December 17, 2022 and accrues interest at a rate of 5% per annum. As of the Petition Date, approximately $45,992.23 in principal amount remains outstanding on the Second Owens Note. Both the First Owens Note and Second Owens Note are secured by a piece of artwork known as the Amitabha thangka located in the DMC library.

### C.  Shambhala USA Promissory Notes

31.     On October 31, 2019, DMC issued a promissory note in favor of Shambhala USA in the original principal amount of $150,000, without interest (the "First Shambhala USA Note"). The First Shambhala USA Note has a maturity date of October 31, 2020. The First Shambhala USA Note provides that, upon default, the entire unpaid balance shall, at the option of Shambhala USA and without notice, become payable at once, and the unpaid principal shall thereafter bear

interest at the rate of 10% per annum.  As of the Petition Date, approximately $150,000 in principal amount remains outstanding on the First Shambhala USA Note.

32.    On January 31, 2020, DMC issued a promissory note in favor of Shambhala USA in the original principal amount of $80,000, without interest (the "Second Shambhala USA Note"). The Second Shambhala USA Note has a maturity date of June 6, 2020.  The Second Shambhala USA Note provides that, upon default, the entire unpaid balance shall, at the option of Shambhala USA and without notice, become payable at once, and the unpaid principal shall thereafter bear interest at the rate of 8% per annum.  As of the Petition Date, approximately $80,000 in principal amount remains outstanding on the Second Shambhala USA Note.

**D.    King Promissory Note**

33.    On April 22, 2021, DMC issued an unsecured promissory note in favor of Robert King and Lindy King in the original principal amount of $125,000 (the "King Note").  The King Note has a maturity date of December 31, 2022, and accrues interest at a rate of 4.50% per annum. As of the Petition Date, approximately $66,587.32 in principal amount remains outstanding on the King Note.

**E.    Gayner Promissory Note**

34.    On August 29, 2014, DMC issued an unsecured promissory note to me in the original principal amount of $40,000 (as amended on April 13, 2016, April 4, 2017, and March 12, 2019, the "Gayner Note").  The Gayner Note has a maturity date of December 31, 2021, and accrues interest at a rate of 5% per annum.  As of the Petition Date, approximately $6,000 in principal amount remains outstanding on the Gayner Note.  I have agreed to suspend payment on the Gayner Note until such time as the Wells Fargo Loan is restructured.

17

### F.     Shambhala Credit Union Line of Credit

35.     On December 12, 2000, DMC and Shambhala Credit Union (f/k/a Ashoka Credit Union) (the "Credit Union") entered into a Credit Union Revolving Credit Plan, pursuant to which the Credit Union agreed to provide an unsecured $49,000 revolving line of credit to DMC (the "Credit Union Line of Credit").   The Credit Union Line of Credit remains available until terminated by DMC or the Credit Union and accrues interest at a rate of 12.5% per annum.   Since December 2020, no amounts have been outstanding on the Credit Union Line of Credit.

## III.    CIRCUMSTANCES LEADING TO THE SUBCHAPTER V FILING

36.     As described above, DMC has a strong, loyal base of donors, volunteers, program participants, and visitors supporting its non-profit mission.   Prior to the COVID-19 pandemic, DMC received substantial revenues from donations, lodging and meeting facility rentals, programs, and gift store sales.   However, the catastrophic impact of the COVID-19 pandemic, the recent Cameron Peak wildfire, and the negative impact of past sexual misconduct by Shambhala's spiritual leader, together with the expiration of the Wells Fargo Loan forbearance created operational and financial difficulties that resulted in the filing of this Subchapter V case.

### A.      COVID-19 Pandemic

37.     In early 2020, the unprecedented outbreak and spread of the COVID-19 pandemic devastated DMC and the rest of the world.   In March 2020, in response to the latest recommendation of the Center for Disease Control and Prevention and executive and public health orders of the State of Colorado, DMC cancelled all on-site programs and closed its facilities to all guests and visitors.[11]   DMC did so to comply with law and to prioritize the health of its community

---

[11]   *See* Executive Order D2020 003, Declaring a Disaster Emergency Due to the Presence of Coronavirus Disease 2019 in Colorado, dated March 11, 2020, https://drive.google.com/file/d/1A7Vufyw4vyTvHdeMU_t_sMxwlCDXA_Js/view; Public Health Order 20-22, Notice of Public Health Order 20-22 Closing Bars, Restaurants, Theaters, Gymnasiums, and Casinos Statewide, dated March 16, 2020, https://drive.google.com/file/d/1zYSF3mAD7IMFK3_Zh9Q7tQYV_KFOIknJ/view;

and staff members.  During this period, DMC lost millions in lodging and program-related revenues.

38.     During the on-site shutdown, DMC sought alternative ways to further its non-profit mission and provide value to the greater community while navigating the challenges of the pandemic.  DMC began providing online programs via Zoom and also engaged in other charitable pursuits such as donating produce of its garden and greenhouse to local food banks and offering DMC as an operational base and refuge for firefighters, emergency response teams, and other frontline workers during the Cameron Peak wildfire.  DMC continued to solicit donations from its dedicated donor base and augmented its revenues with two Paycheck Protection Program Loans of $289,000 each – one in 2020 and a second in February 2021, both of which have been fully forgiven.  DMC also reduced program-related and other expenses to the extent possible to mitigate the negative financial impact of the COVID-19 shutdown.

39.     In July 2021, DMC re-opened its facilities on a limited basis under COVID-19 guidelines developed in consultation with an epidemiologist and federal, state, and local government recommendations.  Guests are required to be fully vaccinated, provide proof of vaccination upon arrival, and wear masks in indoor public spaces.  Since re-opening, DMC has welcomed more than 1,300 overnight guests, 600 online participants, and thousands of day visitors. DMC expects its lodging and program-related revenues to return to pre-pandemic levels as the COVID-19 pandemic begins to recede.

---

Public Health Order 20-23, Notice of Public Health Order 20-23 Implementing Social Distancing Measures, dated March 18, 2020, https://www.bacacountyco.gov/wp-content/uploads/2020/03/Social-Distancing-Public-Health-Order.20-23.pdf; Center for Disease Control and Prevention, Coronavirus disease 2019 (COVID-19) situation summary updated March 18, 2020, https://stacks.cdc.gov/view/cdc/85956].

### B.  Cameron Peak Wildfire

40.     In August 2020, the Cameron Peak wildfire broke out near Chambers Lake, Colorado, approximately 25 miles southwest of DMC's location.  In an effort to prevent the spread of the wildfire, DMC took defensive measures recommended by the local fire department, including trimming grasses and bushes around propane tanks and buildings and removing brush. DMC also provided thousands of gallons of portable water and fresh produce to emergency response teams and, as the fire approached DMC, allowed DMC property to be used as an operational base for fire fighters and emergency response teams.  Unfortunately, the wildfire swept through DMC's property in September 2020, forcing DMC's residential staff to evacuate to safety, destroying 15 buildings (but sparing the Great Stupa), and damaging water, sewer, and electrical systems.  The wildfire was not fully contained until October 2020.  In the end, DMC sustained property damage of more than $1.9 million (but fortunately, no loss of life).

41.     To alleviate the damage from the wildfire, DMC has raised funds from donors to rebuild and repair the buildings and utility systems on its properties, including donations in 2020 of $380,000 to rebuild staff housing and $100,000 to rebuild the platforms for its main shrine tent and for its summer dining tent.  DMC also received insurance proceeds for the covered properties damaged by the wildfire; however, the insurance proceeds are not sufficient to reimburse DMC for the full cost of repairing all of the fire damage.

### C.  Clergy Sexual Misconduct by Shambhala Spiritual Leader

42.     In the summer of 2018, DMC and the rest of the Shambhala community were deeply shaken when multiple students accused the spiritual leader of Shambhala International, Sakyong Mipham Rinpoche, of clergy sexual misconduct.  Following these revelations, Shambhala International commissioned a third-party investigation, which reported in February

2019 that these allegations were credible.  In light of these findings, Sakyong Mipham Rinpoche stepped down from all administrative and teaching responsibilities as Shambhala's leader.

43.     After discovering these revelations, in July 2018, DMC's leadership made public commitments "not to minimize or rationalize the harmful behaviors of the Sakyong or any other teacher or leader of Shambhala," "to stand by the women who had come forward," and to "do what is right, even if it jeopardizes [DMC's] existing power structures or financial position" and provide "transparency now and in the future."[12]  On July 7, 2019, the Denver Post published an article, reporting examples of DMC's mishandling of reports of abuse between the late 1990s and 2008. In response, DMC released a statement acknowledging and apologizing for the reported incidents and the pain caused by its failure to appropriately address such incidents.  DMC also cooperated with an investigation by the Larimer County sheriff into the reported incidents, developed a revised Code of Ethics and grievance procedure, and continued providing regular trainings to its staff members on issues of power and sexual abuse, bystander engagement, and LGBTQ and BIPOC dynamics.  DMC also took legal corporate governance actions to separate itself from its affiliated entities, and now operates as an independent non-profit corporation managed solely by its own six-member board of directors without control or oversight from any other affiliated entity.  In February 2022, in connection with these changes in its corporate governance, Shambhala Mountain Center changed its name to Drala Mountain Center.

44.     Although DMC took steps to address these issues directly and institute changes to its policies and procedures to prevent future sexual misconduct, DMC experienced a reduction in

---

[12]     SMC's Statement Regarding Allegations of Sexual Misconduct by the Spiritual Leader of Shambhala, Sakyong Mipham Rinpoche, July 10, 2018, https://blog.shambhalamountain.org/smcs-statement-regarding-allegations-of-sexual-misconduct-by-the-spiritual-leader-of-shambhala-sakyong-mipham-rinpoche/.

charitable contributions and participation in its programs, resulting in reduced program and lodging revenues in 2019 (as compared to 2018).

### D. Negotiations with Red Hills

45.     In June 2021, DMC learned that Wells Fargo had sold the Wells Fargo Loan to a fund managed by Red Hills.  DMC began good faith negotiations with Red Hills to reach a consensual restructuring of the Wells Fargo Loan that would allow DMC to continue operating and pursuing its non-profit mission.  On November 1, 2021, DMC and Red Hills entered into the Red Hills Forbearance Agreement, which (i) extended the forbearance period for the Wells Fargo Loan to February 28, 2022, (ii) required DMC to make a one-time forbearance payment of $25,000 to be applied to accrued interest, and (iii) provided for continued $5,000 monthly interest payments by DMC.  Under the terms of the Red Hills Forbearance Agreement, interest accrues at a non-default rate of 6.25%.  During the forbearance period, DMC continued to explore strategic alternatives to refinance or restructure the Wells Fargo Loan, and negotiate in good faith with Red Hills.  To date, DMC and Red Hills have not reached agreement on terms for a restructured Wells Fargo Loan.

### E. Donor Commitments

46.      During the forbearance period, DMC continued its efforts to raise funds from donors to pay down the Wells Fargo Loan.  On February 4, 2022, the Pema Chödrön Foundation, a non-profit foundation dedicated to sharing the teachings of renowned Buddhist teacher Pema Chödrön, committed to donate $500,000 to DMC, conditioned on (i) DMC's receipt of matching donations totaling $500,000, (ii) DMC's commitment to launch a fundraising campaign with a target goal of an additional $500,000 in donations during 2022, and (iii) either a refinancing or restructuring of the Wells Fargo Loan on terms satisfactory to the foundation.  In February 2022, DMC obtained commitments for $220,000 in matching donations from six donors.  Of this amount,

$210,000 is currently held in escrow pending the successful completion of this Subchapter V case. To satisfy the contingencies for the Pema Chödrön Foundation Donation, DMC is continuing to raise matching donations and plans to launch a fundraising campaign for an additional $500,000 during the summer of 2022.

## IV.   PROPOSED POSTPETITON USE OF CASH COLLATERAL

47.    As described more fully in the Cash Collateral Motion (as defined below), the Debtor seeks approval for the use of cash collateral (to the extent its cash constitutes cash collateral) to fund its operations and the administrative expenses of this Subchapter V case.[13]  If the Cash Collateral Motion is approved, the Debtor will use its cash in accordance with the Budget (as defined in the Cash Collateral Motion) to continue operating in the ordinary course, by paying employee wages and benefits, utilities, taxes, insurance costs, and customer obligations, as well as other general operating and restructuring expenses.   In addition, DMC will make capital improvements, including to replace tent platforms and structures destroyed in the Cameron Peak wildfire.  Without use of its cash, the Debtor would be required to cease operations, causing immediate and irreparable harm to its estate, creditors, and other stakeholders.

48.    As shown in the proposed budget submitted with the Cash Collateral Motion (the "Budget"), the Debtor will have sufficient cash to pay its general operating and restructuring expenses during the 13-week period covered by the Budget (the "Budget Period").  The Budget was prepared by the Debtor with assistance from its financial advisor, Cordes & Company, and is based upon historical figures.  I believe that the Budget represents a reasonable projection of the Debtor's donations, revenues, and expenses for the Budget Period.

---

[13]    The Debtor asserts that some or all of the funds in its deposit accounts are not Red Hill's cash collateral but has filed the cash collateral motion out of an abundance of caution in the event that Red Hills asserts otherwise.

## V.    FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

49.    Contemporaneously herewith, the Debtor has filed the below list of First Day Motions seeking relief that the Debtor believes is necessary to enable it to efficiently administer its estates with minimal disruption and loss of value during this Subchapter V case.  The facts set forth in each of the First Day Motions are incorporated herein by reference in their entirety.

### A.    Operational Motions Requiring Immediate Relief

- <u>Cash Collateral Motion</u>. *Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief (the "<u>Cash Collateral Motion</u>")*;

- <u>Wages Motion</u>. *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, and Other Compensation and (B) Continue Employee Compensation and Benefits Programs, and (II) Granting Related Relief*;

- <u>Customer Programs Motion</u>. *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Honor Certain Prepetition Obligations to Customers and (B) Continue Certain Customer Programs in the Ordinary Course of Business, and (II) Granting Related Relief*;

- <u>Cash Management Motion</u>. *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Operate its Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief*;

- <u>Utilities Motion</u>. *Motion for Entry of Interim and Final Orders (I) (A) Approving Debtor's Proposed Form of Adequate Assurance of Payment, (B) Establishing Procedures for Resolving Objections by Utility Providers, and (C) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services, and (II) Granting Related Relief*;

- <u>Insurance Motion</u>. *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (II) Granting Related Relief*; and

- <u>Motion Seeking Expedited Entry of First Day Orders</u>. *Motion Seeking Expedited Entry of First Day Orders Pursuant to L.B.R. 2081-1(a) and Notice of Impending Hearing Thereon.*

50.     The First Day Motions request authority to, among other things, use the Debtor's cash collateral (to the extent its cash constitutes cash collateral), honor employee compensation and benefits obligations, continue the Debtor's cash management system for a transitional period, honor certain customer program agreements and deposits, pay insurance obligations, and establish adequate assurance procedures for utilities to ensure minimal disruption of the Debtor's business operations during this Subchapter V case.  For the avoidance of doubt, the Debtor requests authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

51.     The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and potentially irreparable harm to the Debtor and its estate.  I believe an orderly transition into Subchapter V is critical to the viability of the Debtor's operations and that any delay in granting the relief described below would hinder the Debtor's operations and cause potentially irreparable harm.  Other requests for relief will be deferred for consideration at a later hearing.

52.     I have reviewed each of the First Day Motions described herein, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other management personnel and professional advisors.  I can attest to the facts set forth in each of the First Day Motions described herein.  I believe that the relief requested in each of the First Day Motions described herein is (a) necessary to allow the Debtor to operate with minimal disruption during the pendency of this Subchapter V case, (b) critical in ensuring the maximization of value of the Debtor's estate, (c) is essential to achieving a successful reorganization and ultimately emerging as a sustainable enterprise, and (d) serves the best interests of the Debtor's stakeholders.

## <u>CONCLUSION</u>

53.     The Debtor's ultimate goal in this Subchapter V case is to achieve an orderly, efficient, consensual and successful reorganization so that the Debtor can fulfill its non-profit mission and maximize the value of the Debtor's estate for its stakeholders.  To minimize any loss of value, the Debtor's immediate objective is to maintain a business-as-usual atmosphere during the course of this Subchapter V case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtor's business will be substantially enhanced.

*[Signature Page on the Next Page]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: February 28, 2022
Denver, Colorado

/s/ Michael Gayner
Name: Michael Gayner
Title:  Executive Director

## **EXHIBIT A**

PEMA CHODRON FOUNDATION COMMIMTENT LETTER



Shambhala Mountain Center
4921 County Road 68-C
Red Feather Lakes, CO 80545
Attention: Michael Gayner, Chief Executive Officer

<u>Donor Commitment Letter</u>

Dear Mr. Gayner:

The Pema Chödrön Foundation (the "<u>Foundation</u>") has reviewed your request for a donation to Shambhala Mountain Center ("<u>SMC</u>") to serve as the cornerstone for a fundraising campaign to pay down SMC's secured debt to RH Fund XXII, LLC, a fund managed by Red Hills Holdings, LLC (collectively, "<u>Red Hills</u>," and such debt, the "<u>Red Hills Debt</u>"), as part of a debt restructuring that will permit SMC to remain a viable nonprofit institution for the long-term. We are pleased to inform you that we have agreed to donate $500,000 (the "<u>Donation</u>") for this purpose, subject to the conditions set forth below.

The Foundation's commitment to make the Donation is subject to the following conditions:

(i)   SMC's receipt of matching donations totaling $500,000.00,

(ii)  SMC's commitment to launch a fundraising campaign with a target goal of an additional $500,000.00 in donations for the calendar year 2022, and

(iii) either (x) the refinancing of the Red Hills Debt on terms satisfactory to the Foundation, or (y) the restructuring of the Red Hills Debt on terms satisfactory to the Foundation, which may be effectuated through an agreement with Red Hills or the confirmation of a plan of reorganization under Chapter 11 of the Bankruptcy Code.

The Donation shall be payable by the Foundation to SMC upon the satisfaction of these conditions. This commitment shall terminate if the foregoing conditions are not satisfied or waived on or before December 30th, 2022.

On behalf of the Foundation, please know that we are happy to support SMC's educational mission and believe that SMC's retreat center, services, and programs are essential to the community. We wish you much success in your efforts as you undertake the responsibilities in connection with this commitment letter.

BOARD OF DIRECTORS

Pema Chödrön

Tim Olmsted
*President*

Margie Rodgers
*Vice President*

Martha Kirkman
*Secretary*

Arvo Fallon
*Treasurer*

PO Box 770630
Steamboat Springs
Colorado 80477 USA

970-846-2699

www.pemachodronfoundation.org
info@pemachodronfoundation.org

Sincerely,

THE PEMA CHÖDRÖN FOUNDATION

By: _____

Name: Tim Olmsted

Title: President

The Pema Chödrön Foundation is a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code. Contributions are tax-deductible, as allowed by the law.