**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

|  |  |
|---|---|
| In re:<br><br>DRALA MOUNTAIN CENTER (f/k/a SHAMBHALA MOUNTAIN CENTER), a Colorado non-profit corporation<br><br>EIN: 84-1535130<br><br>Debtor. | Chapter 11, Subchapter V<br><br>Case No. 22-10656 (JGR) |

**DEBTOR'S PLAN OF REORGANIZATION**

This Plan of Reorganization (the "Plan") under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of Drala Mountain Center (f/k/a Shambhala Mountain Center), as debtor and debtor-in-possession ("DMC" or the "Debtor") in the above-captioned case as set forth herein.

To creditors: your rights may be affected by this plan. Your claim may be reduced, modified, or eliminated. You may wish to consult an attorney about your rights and your treatment under the Plan.

**PLAN**

**A.      Brief History of the Debtor's Business Operations and Subchapter V Case**

**1.      Overview of Drala Mountain Center**

DMC was founded 50 years ago, in 1971, by Chögyam Trungpa Rinpoche, a Tibetan Buddhist meditation teacher, as a retreat center for meditation and practice in the tradition of the Kagyu and Nyingma lineages of Tibetan Buddhism. In the years since, DMC has sponsored thousands of religious and secular programs on meditation, mind and body awareness, contemplative arts, leadership, yoga, and other areas of personal and social transformation, and has hosted visits and teachings by some of the greatest Buddhist teachers of the 20th and 21st centuries, including His Holiness the 14th Dalai Lama and many others.

DMC is a 501(c)(3) non-profit corporation formed under the Colorado Revised Nonprofit Corporation Act. Formerly known as Shambhala Mountain Center, DMC changed its name in February 2022 to Drala Mountain Center. Its non-profit mission is to serve as a catalyst in creating an enlightened society, grounded in wisdom and kindness towards individuals, the community, and the natural environment. DMC's facilities are located in Red Feather Lakes, Colorado, and it provides meeting facilities, dining, and lodging, and hosts year-round Buddhist and secular programs.

One of DMC's most significant landmarks is The Great Stupa of Dharmakaya (the "Great Stupa"), built over a 13-year period by volunteers and funded entirely through donations. Although located on adjacent land owned by Shambhala USA (f/k/a Shambhala International (Vajradhatu)) ("SUSA"), a non-profit corporation with a shared mission, the Great Stupa is open to the public, is managed by DMC, and is accessible to DMC program participants.

### 2. Events Leading Up to Subchapter V Case

In the years prior to the global COVID-19 pandemic, DMC hosted, on average, more than 10,000 overnight guests and day visitors per year and received over 5,500 individual donations, totaling, on average, over $750,000 per year. COVID-19 forced DMC to close its facilities to the public, however, from March 2020 to July 2021, resulting in significant loss of revenues from its lodging and on-site programs. In addition, in August 2020, the Cameron Peak wildfire swept through DMC land, requiring DMC's residential staff to evacuate to safety, destroying many buildings and tent platforms (but sparing the Great Stupa), and damaging water, sewer, and electrical systems. DMC's programming was also adversely affected in 2018 and 2019 by a "Me Too" scandal involving a prominent Buddhist teacher and leader, Sakyong Mipham Rinpoche, resulting in the cancellation of a number of its largest annual retreat programs.

With the help of its strong community of volunteers, donors, and visitors, DMC believes that these setbacks are temporary. During the COVID-19 shutdown, DMC continued its non-profit mission by offering online programs via Zoom. Following the Cameron Peak wildfire, DMC donors contributed more than $600,000 to rebuild and repair the fire-damaged property. In July 2021, DMC re-opened its facilities on a limited basis under COVID-19 guidelines developed in consultation with an epidemiologist and federal, state, and local recommendations. Since re-opening and through the end of 2021, DMC held programs that have been over-subscribed, welcoming more than 1,300 overnight guests, 600 online participants, and thousands of day visitors.

### 3. Red Hills Loan

In 2005, DMC financed building development through a combination of economic development revenue bonds and secured loans from Wells Fargo Bank, N.A. ("Wells Fargo"). On July 29, 2015, DMC and Wells Fargo entered into a restructuring agreement (the "Restructuring Agreement") that consolidated all of DMC's outstanding funded debt into a single secured loan from Wells Fargo in the original principal amount of $4,150,000. The restructured Wells Fargo debt provided for monthly principal and interest payments in the amount of $24,300, with a June 1, 2016 maturity date (the "Wells Fargo Loan" or, as assigned to RH Fund XXII, LLC, the "Red Hills Loan"). The Wells Fargo Loan was secured by (i) certain of DMC's personal property as identified in certain prepetition security agreements between DMC and Wells Fargo, (ii) certain of DMC's real property as identified in certain prepetition deeds of trust and assignments of rents and leases granted by DMC for the benefit of Wells Fargo, and (iii) certain prepetition deeds of trust on real estate owned by SUSA, leased to DMC under a ground lease, and pledged for the benefit of Wells Fargo.

DMC and Wells Fargo amended the Restructuring Agreement multiple times, extending the maturity date of the Wells Fargo Loan to November 30, 2019 in exchange for lender fees, incremental increases to the interest rate from 5% to 6.25% per annum, and monthly principal and interest payments of $24,300.  In September 2019, Wells Fargo notified DMC that it would not continue extending the maturity date of the Wells Fargo Loan.  DMC entered into a series of forbearance agreements with Wells Fargo from December 2019 to February 2021.  Pursuant to these forbearance agreements, Wells Fargo agreed to accept reduced monthly payments of $5,000 and to forbear from exercising its legal remedies through October 31, 2021.  During the forbearance period, Wells Fargo commissioned an appraisal of DMC's primary real estate, dated December 10, 2020, that determined the value of the property to be $7,700,000.

In May 2021, Wells Fargo sold the Wells Fargo Loan to RH Fund XXII, LLC, a fund managed by Red Hills Holdings, LLC ("Red Hills").  Following negotiations, on November 1, 2021, DMC and Red Hills entered into a new forbearance agreement (the "Red Hills Forbearance Agreement"), which (i) acknowledged the outstanding amount of the Red Hills Loan to be $4,239,441.02 as of October 31, 2021, (ii) extended the forbearance period for the Red Hills Loan to February 28, 2022, (iii) required DMC to make a one-time forbearance payment of $25,000 to be applied to accrued interest, and (iv) provided for continued $5,000 monthly interest payments by DMC.  Under the terms of the Red Hills Forbearance Agreement, interest continued to accrue at the non-default rate of 6.25%.

In October 2021, DMC commissioned an appraisal of its real estate from DRM Real Estate Advisors, LLC ("DRM").  This independent appraiser determined that, based on comparable sales, the estimated market value of DMC's real property and furniture, fixtures, and equipment (excluding specialized artwork and ritual objects) ("FF&E") was $7,000,000 as of October 2, 2021.

During the forbearance period, DMC dedicated significant efforts to raise funds from donors to pay down the Red Hills Loan.  On February 4, 2022, the Pema Chödrön Foundation committed to donate $500,000 to DMC (the "Pema Chödrön Foundation Donation"), conditioned on (i) DMC's receipt of matching donations totaling $500,000, (ii) DMC's commitment to launch a fundraising campaign during 2022 with a target goal of an additional $500,000 in donations, and (iii) either a refinancing or restructuring of the Red Hills Loan on terms satisfactory to the foundation.

### 4.    Other Funded Debt

As of the Petition Date, the Debtor had approximately $4.2 million in principal amount of funded debt obligations (exclusive of accrued interest and fees).  The following chart depicts the Debtor's funded debt structure:

| Type of Debt | Description | Collateral | Approximate Principal Amount Outstanding |
|---|---|---|---|
| **Red Hills Loan** | Consolidated Secured Promissory Note | First lien on certain personal and real property of the Debtor and certain real estate of SUSA | $3,863,071.36 |
| **Felice Owens First Promissory Note** | Secured Promissory Note | Amitabha thangka (artwork) | $25,406.96 |
| **Felice Owens Second Promissory Note** | Secured Promissory Note | Amitabha thangka (artwork) | $45,992.23 |
| **Shambhala USA First Promissory Note** | Unsecured Promissory Note | None | $150,000.00 |
| **Shambhala USA Second Promissory Note** | Unsecured Promissory Note | None | $80,000.00 |
| **Robert & Lindy King Promissory Note** | Unsecured Promissory Note | None | $66,587.32 |
| **Michael Gayner Promissory Note** | Unsecured Promissory Note | None | $6,000.00 |
| **Total** | | | **$4,237,057.87** |

5. **Filing of Subchapter V Case and First Day Motions**

DMC filed this subchapter V case (the "Subchapter V Case") on February 28, 2022 (the "Petition Date") in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") to allow additional time to meet the conditions for receipt of the Pema Chödrön Foundation Donation, to preserve its non-profit mission, and to restructure the Red Hills Loan through a Subchapter V plan of reorganization.  On March 2, 2022, Joli A. Lofstedt was appointed as the Subchapter V trustee in this Subchapter V Case [Docket No. 38] (the "Subchapter V Trustee").

On the Petition Date, the Debtor filed its "first day" motions, requesting emergency relief necessary to maintain and continue its non-profit operations in the ordinary course [Docket Nos. 4–9] (the "First Day Motions").  At the first day hearing on March 4, 2022, no parties objected to the Bankruptcy Court's approval of the First Day Motions on an interim basis and the Bankruptcy Court entered orders approving the First Day Motions on an interim basis [Docket Nos. 64–69].  The final orders for the First Day Motions were presented on a fully-consensual basis to the Bankruptcy Court at the final hearing on March 28, 2022 and were approved by the Bankruptcy Court on a final basis [Docket Nos. 135–140].  On March 14, 2022, the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No. 93], which were amended on April 12, 2022 [Docket Nos. 162 and 163] (as may be further amended, the "Schedules").

Following the filing of the Subchapter V case, the Debtor discovered an error in prepetition amendments to the deeds of trust securing the Red Hills Loan, which inadvertently changed the description of the mortgaged property by (i) removing two parcels belonging to the Debtor (the Campfire Council Parcel and Mildred Mason Parcel), and (ii) adding two adjacent parcels of land belonging to SUSA, including the parcel on which the Great Stupa is located (the "Deed of Trust Error"). In May 2022, DMC commissioned an updated appraisal from DRM, which estimated the market value of the real property and FF&E encumbered by the Red Hills Loan to be $6,000,000 as of May 18, 2022. DRM also appraised the market value of the real property and FF&E described in the initial DRM appraisal at $7,200,000 as of May 18, 2022.

6.     **Plan Negotiations**

During this Subchapter V Case, the Debtor has worked diligently with Red Hills, SUSA (DMC's principal unsecured creditor), the Subchapter V Trustee, and the United States Trustee (the "U.S. Trustee") to reach agreement on terms for a consensual plan of reorganization. On May 16, 2022, the Debtor filed a consensual *Motion for Extension of Time to File Subchapter V Plan* [Docket No. 194] to give the Debtor and other stakeholders more time to reach a consensual plan of reorganization. On June 10, 2022, the Bankruptcy Court entered the *Order Granting Motion for Extension of Time to File Subchapter V Plan* [Docket No. 206], extending the deadline for DMC to file a plan of reorganization to June 30, 2022. On June 29, 2022, the Debtor filed a consensual *Second Motion for Extension of Time to File Subchapter V Plan* [Docket No. 218] seeking a further extension of time to finalize the terms of the consensual plan of reorganization with the Debtor's stakeholders. On July 22, 2022, the Bankruptcy Court entered the *Order Granting Second Motion for Extension of Time to File Subchapter V Plan* [Docket No. 223], further extending the deadline for DMC to file a plan of reorganization to July 31, 2022.

On or about May 31, 2022, the Debtor and Red Hills reached agreement on terms to modify the Red Hills Loan as set forth in the (i) term sheet attached as **Exhibit A-1** hereto (the "Red Hills Term Sheet"), (ii) form of restructuring agreement attached as **Exhibit A-2** hereto (the "Restructuring Agreement"), (iii) form of restructured note attached as **Exhibit A-3** hereto (the "Restructured Red Hills Note"), (iv) forms of amendments to the deeds of trust securing the Red Hills Loan attached as **Exhibit Group A-4** hereto (the "Amendments to Deeds of Trust"), and (v) form of first amendment to amended and restated security agreement attached as **Exhibit A-5** hereto (the "Security Agreement Amendment," and collectively with the Restructuring Agreement, the Restructured Red Hills Note, the Amendments to Deeds of Trust, and the AORs (as defined below), the "Amended Red Hills Loan Documents"). The key terms of the Red Hills Term Sheet are:

- the Debtor will make a $1,000,000 payment (the "Effective Date Payment") on the Red Hills Loan on the effective date of this Plan (the "Effective Date");

- the maturity date for the Red Hills Loan will be extended to the sixth anniversary of the Effective Date, which may be further extended up to an additional two years upon Red Hills' receipt of certain voluntary prepayments by the Debtor;

- the interest rate will be a fixed rate of 6.25% per annum;[1]

- interest will be payable on a monthly basis in arrears, (1) through and including June 30, 2023, $5,000 in cash, with the remainder capitalized and added to principal, and (2) thereafter, in full in cash;

- amortization payments of $25,000 per quarter will be payable beginning on the first day of the calendar quarter following the second anniversary of the Effective Date, with the remainder due and payable on the maturity date; and

- the Deed of Trust Error will be corrected.

In connection with the treatment of the Red Hills Claim (as defined below) in this Plan, it is the Debtor's and Red Hills' unequivocal intent to correct the Deed of Trust Error by entering into the Amended Red Hills Loan Documents. To the extent that the Deed of Trust Error is not corrected by the Debtor's entry into the Amended Red Hills Loan Documents, confirmation of this Plan shall be deemed to affirmatively correct the Deed of Trust Error upon entry of the order confirming this Plan (the "Confirmation Order"). To the extent necessary, Red Hills, the Debtor, and SUSA may rely upon, in addition to the Amended Red Hills Loan Documents, the Confirmation Order to ensure that the Deed of Trust Error has been deemed corrected. The indebtedness due under the Amended Red Hills Loan Documents shall be further secured by the existing Assignment of Rents and Leases recorded (i) December 20, 2005 at Reception No. 2005-0108163 of the real property records of Larimer County, Colorado, (ii) December 27, 2005 at Reception No. 2005-0110081, (iii) July 11, 2008 at Reception No. 20080044462, (iv) July 11, 2008 at Reception No. 20080044460, and (v) September 23, 2014 at Reception No. 20140053831 (collectively, the "AORs").

SUSA has agreed to the restructuring of the Red Hills Loan as set forth in the Red Hills Term Sheet and implemented herein. In addition, conditioned upon the correction of the Deed of Trust Error pursuant to the Amendments to Deeds of Trust, SUSA has agreed to the restructuring of its unsecured note claims pursuant to a restructured consolidated unsecured note in the form attached as **Exhibit B** hereto (the "Restructured SUSA Note"). The Restructured SUSA Note will be payable on the earlier of (i) the payment in full of the Red Hills Claim and all other creditors under the Plan, or (ii) the eighth anniversary of the Effective Date. To the extent requested by any lender refinancing the Restructured Red Hills Note, SUSA will agree to extend the date for payment of the Restructured SUSA Note, modify the Restructured SUSA Note, or subordinate the Restructured SUSA Note to the debt incurred to refinance the Restructured Red Hills Note.

The Pema Chödrön Foundation has also approved the terms of the restructuring of the Red Hills Loan pursuant to the Red Hills Term Sheet and this Plan. During this Subchapter V Case, the Debtor has raised the matching donations required to meet the conditions for the Pema Chödrön Foundation Donation. As of the date of the filing of this Plan, the Debtor has received $494,000 in matching donations in escrow *plus* commitments for an additional $25,000 in matching donations. In addition, contemporaneously with or shortly following the confirmation of this Plan, the Debtor has committed to launch a fundraising campaign for an additional

---

[1] DMC has elected a fixed rate of 6.25% per annum rather than a floating rate of prime plus 1%.

$500,000, the proceeds of which will be used for operations and distributions under this Plan. On this basis, the Pema Chödrön Foundation has sent its pledge of $500,000 into the Debtor's donor escrow, bringing the total donations in escrow to $994,000. Accordingly, the Debtor expects that the conditions for the Pema Chödrön Foundation Donation will be satisfied on the Effective Date and that the Debtor will be able to make the distributions necessary to substantially consummate this Plan on the Effective Date.

This Plan effectuates the agreements with the Debtor's key stakeholders as set forth in the Red Hills Term Sheet and the Restructured SUSA Note. Accordingly, the Debtor expects that Plan will be approved on a consensual basis and that holders of claims against the Debtor that are entitled to vote will vote in favor of this Plan.

## B.    Summary of the Plan

| Class | Description | Estimated Amount[2] | Proposed Plan Treatment | Voting Rights |
|-------|-------------|---------------------|-------------------------|---------------|
| 1 | Priority Tax Claims | $30,441.34 | Payment in cash equal to the Allowed (as defined below) amount of such claim, on or as soon as reasonably practicable after the Effective Date. | Unimpaired Deemed to Accept |
| 2 | Red Hills Claim | $4,366,891.83 | Treatment as provided in the Red Hills Term Sheet, pursuant to the Amended Red Hills Loan Documents. | Impaired Entitled to Vote |
| 3 | First Insurance Funding Claim | $140,198.05[3] | Payment of all obligations under the premium finance agreements with First Insurance Funding in the ordinary course in accordance with the terms and conditions of such agreements. | Reinstated Unimpaired Deemed to Accept |
| 4 | Highroad Secured Trade Claim | $8,000.00 | Payment in cash equal to the Allowed amount of such claim, on or as soon as reasonably practicable after the Effective Date. | Unimpaired Deemed to Accept |
| 5 | Owens Claim | $78,520.66 | Treatment as provided in the form of restructured secured note attached as **Exhibit C** hereto. The payment terms for the Owens Claim are substantially the same as the payment terms for the Unsecured Claims. | Impaired Entitled to Vote |

---

[2]    Other than with respect to the First Insurance Funding Claim, the estimated aggregate claim amounts assume an Effective Date of August 19, 2022.

[3]    Remaining balance outstanding as of July 28, 2022.

| Class | Description | Estimated Amount[2] | Proposed Plan Treatment | Voting Rights |
|---|---|---|---|---|
| 6 | Unsecured Claims (other than SUSA Claim) | $75,684.45 | Holders of Allowed Unsecured Claims will be paid interest from the Effective Date at 5% per annum.<br><br>All Allowed Unsecured Claims will be amortized in equal installments of principal and interest on a quarterly basis and paid in full over five years.<br><br>Holders of Allowed Unsecured Note Claims shall receive their respective forms of restructured unsecured notes attached as **Exhibit D-1** and **Exhibit D-2** hereto, evidencing the payment terms above. | Impaired Entitled to Vote |
| | SUSA Claim | $230,000.00 | SUSA shall have an Allowed claim of $230,000 and receive the Restructured SUSA Note and be paid as provided therein. | Impaired Entitled to Vote |
| 7 | Administrative Convenience Claims | $46,408.70 | Payment in cash in the Allowed amount of such claims on or as soon as reasonably practicable after the later of (x) the Effective Date and (y) if applicable, the date of receipt of such holder's Convenience Claim Election Notice (as defined below) by DMC's counsel. | Unimpaired Deemed to Accept |

### C.    Projected Disposable Income and Means for Implementation

Attached as **Exhibit E** is the projected disposable income of DMC (the "Projected Disposable Income") for the next five years and the underlying assumptions supporting those financials (the "Projections"). Disposable income is the total income projected to be received by DMC that is not reasonably necessary to be expended for the continuation, preservation, or operation of the businesses of DMC ("Required Expenses"). Required Expenses include, without limitation, taxes, payroll, insurance, maintenance expenses for the Debtor's properties, programming expenses, administrative expenses, fees and expenses of teachers and other professionals, food and other supplies, and capital expenditures, including to replace and restore buildings and infrastructure lost or damaged in the Cameron Peak Fire.

DMC's projected disposable income will be used for distributions to creditors as set forth herein. As the Projections reflect, the total estimated amount of distributions over the five-year period from the Plan Effective Date through 2027 is $186,249 to unsecured creditors, and $1,434,613 to Red Hills (not including the Effective Date Payment).

The Projections were developed by the Debtor in consultation with Cordes & Company, the Debtor's financial advisor ("Cordes"). Cordes has expertise and experience in financial advisement, complex business issues, and bankruptcy matters. The Projections are based on DMC's historical and current operations, income, and expenses, combined with reasonable assumptions going forward. In developing the Projections, Cordes has relied upon DMC's management's experience with DMC's business and operations as well as with fundraising from its donor base.

**D.**   **Liquidation Analysis / Best Interests of Creditors Test Satisfied**

To confirm the Plan, the Bankruptcy Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such creditors would receive in a liquidation under chapter 7 of the Bankruptcy Code. The liquidation analysis attached to this Plan as **Exhibit F** demonstrates that the Plan meets this requirement because creditors will be paid over time in full, in cash, with interest to the extent set forth in the Plan (except as otherwise agreed with such creditors).

**E.**   **Feasibility / Ability to Fund Plan**

The Debtor proposes to pay creditors from its Projected Disposable Income, which will be derived from current available assets and program revenues as well as from the Pema Chödrön Foundation Donation, donations of matching donors, and donations received from fundraising campaigns. The Debtor believes the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

**F.**   **Treatment of Claims**

1.   Class 1.  Priority Tax Claims.  Class 1 consists of the priority tax claims of the Internal Revenue Service (the "Priority Tax Claim"), to the extent Allowed. On or as soon as reasonably practicable after the Effective Date, the Internal Revenue Service shall receive payment in cash equal to the Allowed amount of the Priority Tax Claim. Class 1 is unimpaired under the Plan. The Internal Revenue Service shall be conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and shall not be entitled to vote to accept or reject the Plan on account of such claim.

2.   Class 2.  Red Hills Claim.  Class 2 consists of the claims arising from the Red Hills Loan, which shall be Allowed in the amount of (i) all principal and accrued interest at the non-default contractual rate (6.25%) as of the Effective Date, *plus* (ii) reimbursable attorneys' fees and costs incurred through the Effective Date in an amount agreed between the Debtor and Red Hills or, if the Debtor and Red Hills do not agree on the extent of attorneys' fees and costs, in an amount Allowed by the Bankruptcy Court upon a fee application filed by Red Hills on or

prior to the Professional Fee Administrative Claims Bar Date,[4] *minus* (iii) the amount of the Effective Date Payment (the "Red Hills Claim"). On the Effective Date, (i) Red Hills will be paid the Effective Date Payment and will receive the Restructuring Agreement, Restructured Red Hills Note, and Security Agreement Amendment and (ii) the Amendments to Deeds of Trust will be submitted for recording. Class 2 is impaired under the Plan, and Red Hills shall be entitled to vote its Red Hills Claim in Class 2. All post-petition interest at the non-default contractual rate (6.25%) and all reimbursable attorneys' fees and costs incurred by Red Hills and agreed by the Debtor shall be deemed Allowed, pursuant to § 506(b) of the Bankruptcy Code, without the necessity to seek approval of such charges. To the extent that the Deed of Trust Error is not corrected by the Debtor's entry into the Amended Red Hills Loan Documents, confirmation of this Plan shall be deemed to affirmatively correct the Deed of Trust Error upon entry of the Confirmation Order. To the extent necessary, Red Hills, the Debtor, and SUSA may rely upon, in addition to the Amended Red Hills Loan Documents, the Confirmation Order to ensure that the Deed of Trust Error has been deemed corrected. On the Effective Date, Red Hills may take any steps necessary to perfect its security interest in the collateral pledged under the Amended Red Hills Loan Documents. For the avoidance of doubt, the previously recorded AORs shall each be deemed to be an Amended Red Hills Loan Document and shall further secure repayment of the obligations due under the Amended Red Hills Loan Documents.

3.  Class 3. First Insurance Funding Claim. Class 3 consists of the secured claim of First Insurance Funding under the premium finance agreements between the Debtor and First Insurance Funding (the "First Insurance Funding Claim"). The First Insurance Funding Claim shall be reinstated and paid in the ordinary course pursuant to the terms and conditions of the premium finance agreements between the Debtor and First Insurance Funding. Class 3 is unimpaired under the Plan. First Insurance Funding shall be conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and shall not be entitled to vote to accept or reject the Plan on account of such claim.

4.  Class 4. Highroad Secured Trade Claim. Class 4 consists of the Allowed secured claim of the Stockton Roofing, LLC (d/b/a Highroad Roofing) ("Highroad"), which shall be Allowed in the amount of $8,000.00 (the "Highroad Secured Trade Claim"). On or as soon as reasonably practicable after the Effective Date, Highroad shall receive payment in cash equal to the Allowed amount of the Highroad Secured Trade Claim. Class 4 is unimpaired under the Plan. Highroad shall be conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and shall not be entitled to vote to accept or reject the Plan on account of such claim.

---

[4] In the event that the amount of Red Hills' reimbursable attorneys' fees and costs are Allowed after the Effective Date, the Restructured Red Hills Note will be amended and restated to reflect such Allowed amount as additional principal as of the Effective Date.

5.     Class 5.  Owens Claim.  Class 5 consists of the secured note claim of Felice Owens, which shall be Allowed in the amount of all principal and accrued interest at the non-default contractual rate (5%) as of the Effective Date (the "Owens Claim").  The Owens Claim will be paid as provided in the form of a restructured consolidated secured note attached as **Exhibit C** hereto (the "Restructured Owens Note").  Class 5 is impaired under the Plan, and Felice Owens shall be entitled to vote her Owens Claim in Class 5.

6.     Class 6.  Unsecured Claims.  Class 6 consists of Allowed general unsecured claims, other than Allowed Administrative Convenience Claims (the "Allowed Unsecured Claims").[5]  Except to the extent that a holder of an Allowed Unsecured Claim agrees to less favorable treatment, each such holder shall receive the following treatment, as applicable:

(i)     All Allowed Unsecured Claims (other than the SUSA Claim) shall be Allowed as provided herein and shall be paid interest from the Effective Date in arrears at a rate of 5% per annum.

(ii)    All Allowed Unsecured Claims (other than the SUSA Claim) shall be amortized over five years and paid in equal quarterly installments of principal and interest on the last business day of each full calendar quarter following the Effective Date.

(iii)   All Allowed Unsecured Claims (other than the SUSA Claim) shall mature and be paid in full on the fifth anniversary of the Effective Date.

(iv)    The note claims of Robert and Lindy King and Michael Gayner (the "Allowed Unsecured Note Claims") shall be Allowed in the amount of principal and accrued interest at the non-default contractual rate as of the Effective Date.  The Allowed Unsecured Note Claims will be paid as provided in the forms of restructured unsecured notes attached as **Exhibit D-1** and **Exhibit D-2**, respectively (the "Restructured Unsecured Notes"), which incorporate the payment terms set forth in clauses (i) through (iii) above.

SUSA Claim.  SUSA's unsecured note claims shall be Allowed in Class 6 in the amount of $230,000 (the "SUSA Claim").  Conditioned upon the correction of the Deed of Trust Error by the submission for recordation of the Amendments to Deeds of Trust, SUSA has elected less favorable treatment of its SUSA Claim pursuant to the terms of the Restructured SUSA Note.

Class 6 is impaired under the Plan, and holders of Allowed Unsecured Claims (including SUSA as holder of the SUSA Claim) shall be entitled to vote their Allowed Unsecured Claims in Class 6.

---

[5]   DMC believes that all general unsecured claims other than the Allowed Unsecured Note Claims and the SUSA Claim are in amounts less than $15,000 and will, therefore, be treated as Class 7 Administrative Convenience Claims.  Accordingly, DMC anticipates that the only claims in Class 6 will be Allowed Unsecured Note Claims and the SUSA Claim.

7.      <u>Class 7.  Administrative Convenience Claims</u>.  Class 7 consists of Allowed general unsecured claims equal to or less than $15,000, other than Allowed Unsecured Note Claims ("<u>Allowed Administrative Convenience Claims</u>"). Holders of Allowed Administrative Convenience Claims shall receive payment in cash equal to the Allowed amount of such claims, on or as soon as reasonably practicable after the later of (x) the Effective Date, (y) the date such Claim is Allowed, and (z) if applicable, the date of receipt of a Convenience Claim Election Notice by DMC's counsel.  Class 7 is unimpaired under the Plan. Holders of Allowed Administrative Convenience Claims shall be conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and shall not be entitled to vote to accept or reject the Plan on account of such claim.

Holders of general unsecured claims greater than $15,000 (other than Allowed Unsecured Note Claims and the SUSA Claim) may agree to reduce such claims to $15,000 and elect to have such reduced claims be treated as Allowed Administrative Convenience Claims in Class 7 by giving written notice of such election to DMC's counsel, which may be delivered by e-mail as a *.pdf attachment or by mail to Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attention: Eric Sherman, E-mail: Eric.Sherman@ropesgray.com (each, a "<u>Convenience Claim Election Notice</u>") on or before the last business day of the first full calendar quarter following the Effective Date.

8.      <u>Administrative Claims (Unclassified)</u>.  Under § 1123(a)(1) of the Bankruptcy Code, administrative expense claims are not classified.

a.      <u>Administrative Expense Claims of Professionals</u>.  Each holder of a professional fee administrative expense claim shall receive payment of such claim, as soon as reasonably practicable after such claim is approved by the Bankruptcy Court pursuant to a fee application filed within thirty (30) days after the Effective Date ("<u>Professional Fee Administrative Claims Bar Date</u>").

b.      <u>Ordinary-Course Administrative Claims</u>.  Administrative claims resulting from transactions within the ordinary course of DMC's business during this Subchapter V Case shall be paid in full in the ordinary course of business when due.  Holders of ordinary course administrative claims shall not be required to file a request for payment of such claims with the Bankruptcy Court.

9.      <u>Statutory Fees</u>.  All fees required to be paid under § 1930 of title 28 that are owed on or before the Effective Date have been paid or will be paid on the Effective Date.

10.     The Debtor and individual holders of Allowed claims may agree to alternative treatment of such holders' claims, including modifications to the claim amounts,

the payment schedules set forth herein, or the terms of the Amended Red Hills Loan Documents, Restructured Owens Note, Restructured Unsecured Notes, and Restructured SUSA Note (as applicable).

**G.**   **Allowance and Disallowance of Claims**

1.   <u>Allowed Claim</u>.  An "<u>Allowed</u>" claim is a claim that is (i) listed as undisputed, liquidated, and non-contingent in the Schedules (as such Schedules may be amended by the Debtor from time to time) and for which no contrary or superseding proof of claim has been timely filed by the deadline for filing proofs of claim established by the Bankruptcy Court, or (ii) evidenced by a proof of claim that has been timely filed by the deadline for filing proofs of claim established by the Bankruptcy Court, which is not subject to an objection by the Debtor or another party filed with the Bankruptcy Court and which has not been denied, stricken or otherwise disallowed by order of the Bankruptcy Court. The amount of each Allowed claim shall be reduced by any amount that has been paid, released or otherwise satisfied prior to the Effective Date.

2.   <u>Disputed Claim</u>.   A disputed claim is a claim that has not been Allowed or disallowed by a final non-appealable order, and as to which either:

   (i)   a proof of claim has been filed, and the Debtor or another party in interest has filed an objection; or

   (ii)   no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

3.   <u>Delay of Distribution on a Disputed Claim</u>.  No distribution will be made on account of a disputed claim unless such claim is Allowed by a final non-appealable order.

4.   <u>Settlement of Disputed Claims</u>.  The Debtor will have the power and authority to settle and compromise a disputed claim with Bankruptcy Court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**H.**   **Executory Contracts and Unexpired Leases**

All of the Debtor's executory contracts and unexpired leases shall be assumed by the Debtor and the Debtor as it exists post-Effective Date (the "<u>Reorganized Debtor</u>").  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.  The Debtor does not believe any prepetition cure payments are owed or will become due and owing in respect of its executory contracts and unexpired leases.

If you object to the assumption of your executory contract or unexpired lease or believe you are entitled to a prepetition cure amount, or object to the proposed cure of any defaults or the adequacy of assurance of performance, you must file and serve your objection to the Plan within

the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier deadline.

All of the Debtor's insurance policies shall be deemed and treated as executory contracts pursuant to the Plan, shall be assumed by the Debtor and Reorganized Debtor, and shall continue in full force and effect thereafter in accordance with their respective terms. All insurance policies shall vest in the Reorganized Debtor.

## I.     Post-Confirmation Management and Employment / Retention of Insiders

The Debtor's post-confirmation management will be Michael Gayner, as Executive Director and Kevin Suh, as Chief Financial Officer. Michael Gayner and Kevin Suh will receive annual compensation and benefits substantially consistent with their prepetition annual compensation and benefits. The Debtor's post-confirmation directors will be Michael Gayner, Connie Rogers, Amelia Bracher, Karen Wildling, Ming-Lien Linsely, and Cliff Neuman. The Debtor will retain all of its current employees.

The appointment to, or continuance in, such office of these individuals, is consistent with the interests of creditors and with public policy. In particular, the retention of Michael Gayner and Kevin Suh as officers of DMC is crucial to DMC maintaining its business relationships and continuing its non-profit mission, as each has operational knowledge and contacts in the Shambhala community, which are vital to the success of the Reorganized Debtor. The Reorganized Debtor could not likely sustain its projected operations without their continued employment.

## J.     Subchapter V Trustee

1.     <u>Consensual Plan</u>. If the Plan is confirmed under § 1191(a) of the Bankruptcy Code, the service of the Subchapter V Trustee shall terminate when the Plan has been substantially consummated. Substantial consummation shall be deemed to occur upon the Effective Date of the Plan.

2.     <u>Non-Consensual or Cramdown Plan</u>. If the Plan is confirmed on a non-consensual basis under § 1191(b) of the Bankruptcy Code with respect to Classes 5 and 6, then except as otherwise provided in the Plan or Confirmation Order, the Debtor shall make all payments due under the Plan to holders of claims in Classes 5 and 6 to the Subchapter V Trustee. The following provisions shall apply to all claims and disbursements made by the Debtor with respect to Classes 5 and 6 under the Plan:

a.     The Debtor shall file with the Bankruptcy Court, as a supplement to the Plan and provide notice to all creditors in Classes 5 and 6 at or before confirmation, a list of all holders of claims in Classes 5 and 6, the total amount to be paid to each such holder under the Plan (inclusive of all Allowed interest) and the payment terms and schedule for each such holder under the Plan.

b.     The Debtor shall timely make the payments due under the Plan to Classes 5 and 6 to the Subchapter V Trustee. If the Debtor fails to timely make

any Plan payment to the Subchapter V Trustee as provided in this paragraph, the Subchapter V Trustee may file and serve a notice of delinquency upon the Debtor and the Debtor's attorneys. The Debtor shall have 45 days from the date of the notice of delinquency to make all payments due under the Plan with respect to Classes 5 and 6 to the Subchapter V Trustee, including any payments that become due within the 45-day period. If the Debtor is seeking to cure the delinquency in a modified Plan, the Debtor must file a motion to modify the confirmed Plan within 45 days of the notice of delinquency. If the Debtor is not current with payments under the Plan on the 45th day after the date of the notice of delinquency or has not filed a motion to modify within that time period, the Subchapter V Trustee will file and serve a report of non-compliance and may thereafter seek the dismissal or conversion of the case to Chapter 7.

      i.      All payments under the Plan will be made by the Subchapter V Trustee to the holder of each Allowed claim in Classes 5 and 6 at the address of such holder as listed on the Debtor's schedules or proof of claim, unless the Subchapter V Trustee has been notified in writing of a change of address.

      ii.      Any payment required to be made under the Plan on a day other than a business day shall be made on the next succeeding business day.

      iii.      For the avoidance of doubt, this Section J(2) shall not apply to the SUSA Claim or any classes of claims other than Class 5 and 6. Allowed Claims in Classes 1, 4, and 7 shall be paid by the Debtor on or as soon as reasonably practicable after the Effective Date. As described in Section A.6 above, Red Hills and SUSA have agreed to the treatment of their Allowed claims as set forth in this Plan. The First Insurance Funding Claim in Class 3 shall be reinstated and paid in the ordinary course by the Debtor pursuant to the terms and conditions of the premium finance agreements between the Debtor and First Insurance Funding (the "Premium Financing Agreements") and the continued payment of the First Insurance Funding Claim in the ordinary course is critical to maintaining the Debtor's insurance coverage. Pursuant to the *Final Order (I) Authorizing the Debtor to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (II) Granting Related Relief* [Docket No. 140], the Bankruptcy Court has authorized the Debtor to pay, and the Debtor has continued to pay, all amounts owing under the Premium Financing Agreements as they become due.

      iv.      Upon completion of all payments due under the Plan in respect of claims in Classes 5 and 6 (other than the SUSA Claim), the Debtor may seek an order of the Bankruptcy Court confirming discharge

of all Class 5 and 6 Claims (other than the SUSA Claim) ("Discharge Order").

3.      Compensation.  Under § 330 of the Bankruptcy Code, the Subchapter V Trustee shall be compensated for services and reimbursed for expenses.  However, the method of payment of the Subchapter V Trustee compensation depends on the provision under which the Plan is confirmed and the method of disbursement to creditors under the Plan:

a.      The Subchapter V Trustee will apply to the Bankruptcy Court for an award of compensation through the application process that is used by professionals.  The Subchapter V Trustee will file a final fee application for compensation to be heard with the other final fee applications in the case.

b.      If the Plan is confirmed on a consensual basis under § 1191(a) of the Bankruptcy Code, then the Subchapter V Trustee's services shall end with substantial consummation of the Plan under § 1183(c)(1) of the Bankruptcy Code, and the Subchapter V Trustee may collect compensation for all services in an amount approved by order of the Bankruptcy Court.  Substantial consummation of the Plan under § 1183(c)(1) of the Bankruptcy Code will be deemed to occur on the Effective Date.  The Subchapter V Trustee's allowed compensation is payable as soon as practicable after an order allowing the same becomes a final, non-appealable order, unless the Subchapter V Trustee agrees to different treatment.

c.      If the Plan is confirmed on a non-consensual basis under § 1191(b) of the Bankruptcy Code, then the Subchapter V Trustee will remain in place until all payments have been made to unsecured creditors (other than in respect to the SUSA Claim), and the Subchapter V Trustee may be entitled to additional compensation for services provided after confirmation.  The Subchapter V Trustee may file fee applications throughout such period.  Upon approval of the Subchapter V Trustee's fee applications in a non-consensual case, the Debtor shall pay all fee amounts due to the Subchapter V Trustee as soon as practicable after the order allowing the same becomes a final, non-appealable order, unless the Subchapter V Trustee agrees to different treatment.

## K.      Additional Provisions

1.      Definitions and Rules of Construction.  The definition and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms are defined or construed in the Bankruptcy Code are used in this Plan and are otherwise undefined.

2.      Unclaimed Distributions.  Any distribution of cash or other property under the Plan that is unclaimed for a period of six (6) months after such distribution was made shall constitute unclaimed property and shall be returned to the Debtor.  Any entitlement of any holder of any claim to such distribution shall be extinguished and forever barred.

3.      Effective Date.  The Effective Date of this Plan shall occur upon the satisfaction of the following conditions:  (i) entry of the Confirmation Order and, if applicable, expiration of any stay of the Confirmation Order, (ii) Red Hills' receipt of the Effective Date Payment, (iii) execution of the Amended Red Hills Loan Documents, Restructured Owens Note, Restructured Unsecured Notes, and Restructured SUSA Note (collectively, the "Plan Restructuring Documents"), and (iv) submission for recordation of the Amendments to Deeds of Trust.

4.      Severability.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

5.      Binding Effect.  The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

6.      Captions.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

7.      Corporate Governance.  As a non-profit corporation, DMC has no stockholders and issues no securities.  Therefore, § 1123(a)(6) of the Bankruptcy Code barring the issuance of non-voting securities is inapplicable.

8.      Amended Claims.  Claimants shall not be permitted to amend or otherwise modify any claim after the later of the claims bar date or the confirmation date without the consent of the Debtor.  Any amendment to a claim filed after the later of the claims bar date or the confirmation date shall be deemed disallowed in full and expunged without any action by the Subchapter V Trustee or Debtor unless the claimholder has obtained the Debtor's prior written consent for the filing of such amendment.  The Subchapter V Trustee and Debtor shall have no obligation to recognize any transfer of any claim after distributions have started.

9.      Default Remedies.  If the Debtor does not make the payments provided for under the Plan as and when due, the Debtor will be in default under the Plan ("Default").  After substantial consummation of a consensual Plan, remedies for Default shall be as provided in the Plan and in the Plan Restructuring Documents.

10.     Vesting of Assets.   As of the Effective Date, pursuant to Bankruptcy Code § 1141(b), all property of the Debtor's estate will vest in the Reorganized Debtor, and pursuant to Bankruptcy Code § 1141(c), such vesting will be free and clear of any and all liens, debts, obligations, claims, liabilities, and all other interests of every kind and nature, except as provided for in the Plan and the Plan Restructuring Documents.

11.     Discharge.

a.      Consensual Plan.  If the Plan is confirmed under Bankruptcy Code § 1191(a), then pursuant to § 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan and the Plan Restructuring Documents shall be in complete satisfaction, discharge, and release, effective as

of the Effective Date, of claims, interests, and causes of action against the Debtor of any nature whatsoever (including any fees, interest, or expenses accrued on claims from and after the Petition Date), and liabilities of, liens on, obligations of, rights against, and interests in, the Debtor or any of its assets or properties, whether known or unknown, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such claims, interests, and causes of action, including demands, liabilities, and causes of action that arose before the Effective Date, and any liability to the extent such claims or causes of action accrued before Effective Date.   On the Effective Date, the Reorganized Debtor will be discharged from any claims, interests, and causes of action that arose before the Effective Date, as specified in § 1141(d)(1)(A) of the Bankruptcy Code, except as provided in clause (c) below.

b. <u>Non-Consensual Plan</u>.  If the Plan is confirmed under Bankruptcy Code § 1191(b), confirmation of the Plan does not discharge any debt provided for in this Plan until entry of the Discharge Order.

c. <u>Exceptions to Discharge</u>.  Notwithstanding the discharge provided in Sections K.11(a) and (b), the Debtor will not be discharged of any claims: (i) imposed by this Plan or the Plan Restructuring Documents; or (ii) of a kind specified in Bankruptcy Code § 1141(d)(6)(B).

d. <u>Automatic Stay</u>.   For the avoidance of doubt, if the Plan is confirmed under Bankruptcy Code § 1191(b), the automatic stay shall remain in effect until entry of the Discharge Order.

12. **<u>Exculpation</u>.   Except as specifically provided in the Plan, neither the Debtor's directors and officers nor the estate professionals (including, but not limited to, the Debtor's attorneys and financial advisors and the Subchapter V Trustee), shall have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission during and in connection with the Subchapter V Case, except for their gross negligence, willful misconduct, or actual fraud.**

13. **<u>Injunction</u>.**

a. **<u>Consensual Plan</u>.  If the Plan is confirmed under Bankruptcy Code § 1191(a), then except as otherwise specifically provided in the Plan or the Confirmation Order, all entities and persons, and any successor, assigns or representatives of such entities and persons, who have held, hold, or may hold claims, rights, causes of action, liabilities, or any other interests based on any act or omission, transaction, or other activity of any kind or nature related to the Debtor or the Subchapter V Case that occurred prior to the Effective Date ("<u>Enjoined Claim</u>"), regardless of the filing, lack of filing, allowance or disallowance of such claim or interest, and regardless of whether such entity or person has voted to accept**

the Plan, shall be precluded and permanently enjoined on and after the date the Bankruptcy Court enters the Confirmation Order, from (a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtor, (ii) any assets re-vested in the Reorganized Debtor, or (iii) the Debtor or the Reorganized Debtor; (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order with respect to any Enjoined Claim, against (i) any assets of the Debtor, (ii) any assets re-vested in the Reorganized Debtor, or (iii) the Debtor or the Reorganized Debtor; (c) the creation, perfection, or enforcement of any encumbrance or lien of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtor, (ii) any assets re-vested in the Reorganized Debtor, or (iii) the Debtor or the Reorganized Debtor; and (d) taking any action whatsoever with respect to any claims against (i) any assets of the Debtor, (ii) any assets re-vested in the Reorganized Debtor, or (iii) the Debtor or the Reorganized Debtor.

   b. **Non-Consensual Plan.**  **If the Plan is confirmed under Bankruptcy Code § 1191(b), the injunction provided for in clause (a) above shall become effective upon entry of the Discharge Order.**

   14. <u>Request for "Cram Down" of Non-Accepting Classes</u>.  The Debtor requests that the Bankruptcy Court confirm the Plan notwithstanding the failure of classes to vote to accept the Plan.  Even if one or more impaired classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in a manner prescribed by § 1191 of the Bankruptcy Code.  A Plan that binds non-accepting classes is commonly referred to as a "cram down" Plan.  The Bankruptcy Code allows the Plan to bind non-accepting classes of claims if it meets all the requirements for consensual confirmation, except the requirements of §§ 1129(a)(8), 1129(a)(10), or 1129(a)(15) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan under the standard of § 1191(c) of the Bankruptcy Code.  **Creditors concerned with how the cram down provisions will affect their claim should seek independent counsel, as the variations on this general rule are numerous and complex.**  The Debtor is not required to file a motion or other pleading to seek and obtain cram down of a Plan.  As a result, the Debtor will seek the Bankruptcy Court's confirmation of this Plan in accordance with the cram down provisions of the Bankruptcy Code at the date and time of the Confirmation Hearing without further notice to creditors or other parties in interest.

   15. <u>Retention of Jurisdiction</u>.  Until the case is closed, the Bankruptcy Court shall retain jurisdiction to ensure that the purpose and intent of the Plan are carried out.  The Bankruptcy Court shall retain jurisdiction to hear and determine the following:

   a. the classification of the claim of any creditor and the re-examination of claims which have been Allowed for purposes of voting and the determination of such objections as may be filed against creditors' claims;

   b. the determination of all questions and disputes regarding title to the assets of the estate and the determination of all causes of action, controversies,

disputes, or conflicts, whether or not subject to an action pending as of the date of confirmation between the Debtor and any other party, including but not limited to any rights of parties in interest to recover assets pursuant to the provisions of the Bankruptcy Code;

c.      the correction of any defect, the curing of any omission or the reconciliation of any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

d.      the correction of the Deed of Trust Error;

e.      the modification of this Plan after confirmation pursuant to the Federal Rules of Bankruptcy Procedure and the Bankruptcy Code;

f.      the enforcement and interpretation of the terms and conditions of this Plan, including but not limited to questions relating to the scope of the injunction and its application to Enjoined Claims;

g.      the entry of an order, including injunctions, necessary to enforce the title rights and powers of parties in interest and to impose such limitations, restrictions, terms and conditions of such title rights and powers as the Bankruptcy Court may deem necessary; and

h.      the entry of an order concluding and terminating this case.

16.    Limitation of Jurisdiction.   Upon the occurrence of the Effective Date, the Bankruptcy Court shall have no jurisdiction with respect to Red Hills' enforcement of the Debtor's obligations under the Amended Red Hills Loan Documents, except as provided in Section K.15(d).

17.    Closing of Case.  If this Plan is confirmed under Bankruptcy Code § 1191(a), the Effective Date has occurred, and the Bankruptcy Court has entered an order on all professional fee applications filed pursuant to Sections F.2, F.8, and J.3, the Debtor shall request the Bankruptcy Court to enter an order closing the case and the Bankruptcy Court may close the case if there are no pending contested matters or adversary proceedings.  If this Plan is confirmed under Bankruptcy Code § 1191(b) and the Effective Date has occurred and all payments due under the Plan in respect of claims in Classes 5 and 6 (other than the SUSA Claim) have been completed, the Debtor may request the Bankruptcy Court to enter an order closing the case and the Bankruptcy Court may close the case if there are no pending contested matters or adversary proceedings.

18.    Waiver of Federal Rule of Civil Procedure 62(a).  The Debtor requests that the Confirmation Order include (a) a finding that Fed R. Civ. P 62(a), as adopted by Federal Bankruptcy Rule 7062, shall not apply to the Confirmation Order, and (b) authorization for the Debtor to consummate the Plan immediately after entry of the Confirmation Order.

Respectfully submitted,

Dated: July 28, 2022
   Boston, Massachusetts

ROPES & GRAY LLP

/s/ *Patricia I. Chen*
James M. Wilton
Patricia I. Chen
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Email:  james.wilton@ropesgray.com
Email:  patricia.chen@ropesgray.com

-and-

MARKUS WILLIAMS YOUNG & HUNSICKER
LLC
James T. Markus
1775 Sherman Street, Suite 1950
Denver, CO 80203
Phone:  303-866-0102
Email:  jmarkus@markuswilliams.com

*Counsel to the Debtor*